

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

SEP 2 6 2012

CLERK, U.S. DISTRICT COURT
By _____ CTF
         Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATES OF TEXAS, NEW MEXICO and LOUSIANA, *ex rel.* VERONICA GARCIA, | CIVIL ACTION NO. |
| | |
| PLAINTIFFS AND RELATOR, | 3:12-cv-02126-P |
| | |
| v. | **FIRST AMENDED FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL** |

CHRIS STEVEN VILLANUEVA, Individually and as member/managing member of Defendant companies; TRUNG MINH TANG, Individually and as member/managing member of Defendant companies; MAURICIO DARDANO, Individually and as member/managing member of Defendant companies; MB2 DENTAL SOLUTIONS, PLLC; DENTAL PROFESSIONALS OF TEXAS, PLLC; VILLANUEVA UNIVERSAL ENTERPRISES, LLC; PEPPERMINT DENTAL, PLLC; ARCHSTONE DENTAL, PLLC; PICASSO DENTAL, PLLC; DENTAL FAMILY CIRCLE, PLLC; VILLANUEVA PLAZA, LLC; PEPPERMINT DENTAL-MCKINNEY, PLLC; DFW FDC-REDBIRD, PLLC; PICASSO DENTAL-MANSFIELD, PLLC; ARCHSTONE DENTAL-BEACH, PLLC; VIVA ORTHODONTICS, PLLC; PICASSO DENTAL-CORSICANA, PLLC; CHRISS VILLANUEVA DENTAL, PA; DFW-FDC, PA; CROWN NOW DENTAL, PLLC; MINT REALTY, LLC; LEGEND DENTAL, PLLC; ARCHSTONE DENTAL-GRANBURY, PLLC; PEPPERMINT DENTAL-GREENVILLE, PLLC; CRESCENT DENTAL, PLLC; FRESH DENTAL, PLLC; ELEMENT DENTAL, PLLC; BLISS DENTAL, PLLC; SAGE DENTAL, PLLC; BLISS DENTAL-MIDLAND, PLLC; SAGE DENTAL-DEER PARK, PLLC; CRESCENT DENTAL-SAN MARCOS, PLLC; ELEMENT DENTAL-BRYAN, PLLC; ELEMENT DENTAL-CONROE, PLLC; SAGE DENTAL-PEARLAND, PLLC; SAGE DENTAL-

**FILED IN CAMERA AND UNDER SEAL**

1

PASADENA, PLLC; TIDE DENTAL-CORPUS
CRISTI, PLLC; SPEARMINT DENTAL-
WITCHITA FALLS, PLLC; SCARLET PEGASUS
GROUP, LLC; FRESH DENTAL-LONGVIEW,
PLLC; LEGEND DENTAL-GEORGETOWN,
PLLC; WOW DENTAL-OAK CLIFF, PLLC;
BLISS DENTAL-LUBBOCK, PLLC; GALAXY
DENTAL-GARLAND, PLLC; PEACH TREE
DENTAL-CARROLLTON, PLLC; ARCHSTONE
DENTAL-HULEN, PLLC; IRVING TOWN
CENTER DENTAL, PLLC; SOUTHERN GEM
DENTAL, PLLC; LUCKY DENTAL, PLLC;
CRESCENT DENTAL-INGRAM, PLLC;
ELEMENT DENTAL-SPRING, PLLC; VIDA
DENTAL, PLLC; GULFSIDE DENTAL-
BEAUMONT, PLLC; DENTAL CENTERS, PLLC;
SLAP-ON, INC.; PEPPERMINT DENTAL-
MCKINNEY, PLLC; DENTAL CENTRAL, PLLC;
ARCHSTONE DENTAL-WEATHERFORD,
PLLC; PEPPERMINT DENTAL-SHERMAN,
PLLC; PEPPERMINT DENTAL-LEWISVILLE,
PLLC; ELEMENT DENTAL-HUMBLE, PLLC;
ELEMENT DENTAL-TOMBALL, PLLC; and
BALENTIMES HOLDINGS, LTD., PEPPERMINT
DENTAL-MONTGOMERY, LLC, PEPPERMINT
DENTAL-RIO BRAVO, LLC, PEPPERMINT
DENTAL-SAN MATEO, LLC, RED ROCK
DENTAL-FARMINGTON, LLC, FRESH
DENTAL-BOSSIER CITY, PLLC, FRESH
DENTAL-SHREVEPORT, PLLC;

      DEFENDANTS.

---

## I.    BACKGROUND

Veronica Garcia ("Relator") brings this action on behalf of the United States of America

("United States") for treble damages and civil penalties arising from the conduct of Defendants

Chris Steven Villanueva ("Villanueva"), Trung Minh Tang ("Tang"), Mauricio Dardano

("Dardano"), MB2 Dental Solutions, PLLC; Dental Professionals Of Texas, PLLC; Villanueva

Universal Enterprises, LLC; Peppermint Dental, PLLC; Archstone Dental, PLLC; Picasso

Dental, PLLC; Dental Family Circle, PLLC; Villanueva Plaza, LLC; Peppermint Dental-McKinney, PLLC; DFW FDC-Redbird, PLLC; Picasso Dental-Mansfield, PLLC; Archstone Dental-Beach, PLLC; Viva Orthodontics, PLLC; Picasso Dental-Corsicana, PLLC; Chris Villanueva Dental, PA; DFW FDC, PA; Crown Now Dental, PLLC; Mint Realty, LLC; Legend Dental, PLLC; Archstone Dental-Granbury, PLLC; Peppermint Dental-Greenville, PLLC; Crescent Dental, PLLC; Fresh Dental, PLLC; Element Dental, PLLC; Bliss Dental, PLLC; Sage Dental, PLLC; Bliss Dental-Midland, PLLC; Sage Dental-Deer Park, PLLC; Crescent Dental-San Marcos, PLLC; Element Dental-Bryan, PLLC; Element Dental-Conroe, PLLC; Sage Dental-Pearland, PLLC; Sage Dental-Pasadena, PLLC; Tide Dental-Corpus Cristi, PLLC; Spearmint Dental-Witchita Falls, PLLC; Scarlet Pegasus Group, LLC; Fresh Dental-Longview, PLLC; Legend Dental-Georgetown, PLLC, Wow Dental-Oak Cliff, PLLC; Bliss Dental-Lubbock, PLLC; Galaxy Dental-Garland, PLLC; Peach Tree Dental-Carrollton, PLLC; Archstone Dental-Hulen, PLLC; Irving Town Center Dental, PLLC; Southern Gem Dental, PLLC; Lucky Dental, PLLC; Crescent Dental-Ingram, PLLC; Element Dental-Spring, PLLC; Vida Dental, PLLC; Gulfside Dental-Beaumont, PLLC; Dental Centers, PLLC; Slap-On, Inc.; Peppermint Dental-McKinney, PLLC; Dental Central, PLLC; Archstone Dental-Weatherford, PLLC; Peppermint Dental-Sherman, PLLC; Peppermint Dental-Lewisville, PLLC; Element Dental-Humble, PLLC; Element Dental-Tomball, PLLC; Balentimes Holdings, Ltd., Peppermint Dental-Montgomery, LLC, Peppermint Dental-Rio Bravo, LLC, Peppermint Dental-San Mateo, LLC, Red Rock Dental-Farmington, LLC, Fresh Dental-Bossier City, PLLC, and Fresh Dental-Shreveport, PLLC (hereinafter, sometimes collectively referred to as the "dental practice defendants" or "DP") in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). The violations arise out of false claims for payment made to Medicaid and other federally funded

government healthcare programs (hereinafter, collectively referred to as "Government Dental Care Programs").

1.      This action is also brought under the *qui tam* provisions of the Texas Medicaid Fraud Prevention Law, V.T.C.A., Hum. Res. Code Ann. §36.001 on behalf of the State of Texas, the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§46:439.1 *et seq.*; 438.3 on behalf of the State of Louisiana and the New Mexico Medicaid False Claims Act N.M. Stat. Ann§§ 27-14-1 *et seq.*on behalf of the State of New Mexico.

2.      The States of Texas, Louisiana and New Mexico and the United States are hereafter collectively referred to as the Government.[1]

3.      As alleged herein, beginning as early as in or about 2009, Defendants Villanueva, Tang and Dardano, individually and by and through the Dental Practice Defendants, caused hundreds of thousands of false claims to be made on federal and state dental health care programs. Defendants accomplished this by (a) engaging in a systematic program of "kickbacks" to patients and their families to entice them to use Defendants' dental services; (b) engaging in a systematic program of "kickbacks" to marketers who solicited individual patients, through in-person contact, or other means to entice them to refer dental patients to the Defendants; (c) providing medically unnecessary and excessive dental services to patients many of whom were children; and (d) billing for services which were not provided at all.

---

[1]  The Complaint included the following footnote: This scheme of False Claim Act violations was also undertaken by Villanueva and Tang in Oklahoma, New Mexico and Louisiana however the number of dental practices in those states is substantially less than those in Texas. The dental companies owned and operated by Villanueva and Tang in these additional States violated the False Claims Act and State qui tam statutes in the same manner as described herein. In this amendment, Plaintiffs include the States of New Mexico and Louisiana and those dental practices described above are included as Defendants.

4.     These illegal actions and resulting false claims caused the federal and state governments to pay out funds that they otherwise would not have paid and unlawfully enriched Defendants.

## II.     FEDERAL JURISDICTION AND VENUE

5.     The acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein occurred in the State of Texas and primarily in the Northern District of Texas and elsewhere, as Defendant Tang resides in Dallas County and many of the DP are located in the Dallas/Fort Worth area of the State of Texas. Most of the Defendants are incorporated in the State of Texas, four in the State of New Mexico and two in the State of Louisiana.  Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732 (a), as well as under 28 U.S.C. § 1345.

6.     This Court has supplemental jurisdiction over this case for the claims brought on behalf of the States of Texas, Louisiana and New Mexico pursuant to 31 U.S.C. §3732(b) and/or 28 U.S.C. § 1367, inasmuch as recovery is sought on behalf of said States which arise from the same transactions and occurrences as the claims brought on behalf of the United States.

7.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the individual Defendants are residents of Texas and most of the DP defendants have their primary place of doing business in the State of Texas with the majority of Defendants doing business/residing in the Northern District, Dallas Division.  The corporate Defendants transact business and the individual defendants reside and conduct business in Texas and one or more of the acts proscribed by section 31 U.S.C. §3729 occurred in this State.

8.     This court has jurisdiction of the subject matter of this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and has personal jurisdiction over defendants because

most of the DPs are incorporated in Texas and each of them do business, and the individual defendants reside, in the Northern District of Texas.

9. The facts and circumstances alleged in this complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

10. To the Extent that these facts and circumstances have been publicly disclosed, Relator is an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act, 31 U.S.C. § 3730(e)(4) (2010).[2] Specifically Relator has knowledge and provided evidence and information that is independent of and materially adds to the publicly disclosed allegations or transactions.

## III.    PARTIES

11. The United States funds the provision of medical care, including dental preventative and maintenance care, surgery and procedures including orthodontia, for eligible citizens including mostly children through Government Healthcare Programs and primarily Medicaid.

12. Relator Veronica Garcia is a citizen of the United States and a resident of the State of Texas. As described in further detail below, as a result of being recruited by Dental Professionals of Texas, PLLC she began work for Dental Professionals of Texas, PLLC on July 8, 2011. Relator was retained to serve as office manager for Defendant Wow Dental at the

---

[2] The FCA was amended effective in July 2010 to provide as follows: (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or **(2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.** [Emphasis supplied.]

Dallas office. Months later, Relator was promoted to the position of "regional manager" for the Wow Dental offices, including Wow Dental – Oakcliff, PLLC where she had access to all patient records, billings, marketing, budget and other information related to the solicitation of patients, Medicaid billing, time allotted for treatment and other pertinent patient information concerning these two DPs and other DPs owned and operated by Villanueva, Tang and Dardano and Dental Professionals of Texas, PLLC.[3]

13.     In the latter part of March 2012, Relator was again "promoted", to serve as the second in command of KHB Community Outreach Associates, LLC which operates as Texas Community Outreach. In that capacity Relator is familiar with all of the "marketing," direct solicitation, payments and "promotions" provided to patients, patients' parents or relatives and the entire "sales team" of individuals statewide who were paid to illegally solicit Medicaid patients for Villanueva, Tang, Dardano and the DP defendants.

14.     Relator is the original source of the facts and information hereinafter set forth concerning the illegal activities of the Defendants.

15.     Relator has worked in account management and dental practices for more than a decade before working for Dental Professionals of Texas, PLLC. She is a college student with grown children.

---

[3] Dental Professionals of Texas, PLLC changed its name to MB2, Dental Solutions, PLLC, after receiving negative publicity from an investigation undertaken by a Dallas news station. The name change was effected through the filing of a Certificate of Amendment to the Certificate of Information concerning Dental Professionals of Texas, PLLC, on February 23, 2012. Trung Tang is the registered agent for MB2 which shares an address with Dental Professionals of Texas, PLLC, specifically: 7301 State Highway 161, Suite 198, Irving, TX, 75205-2880. Members of MB2, PLLC, include defendants Villanueva, Tang and Dardano and also Christopher Swayden, Garbriel Shahwan, Akhil Reddy and Shane Tolleson, other dentists who facilitated the False Claims Acts violations. Akhil Reddy and Shane Tolleson are the only two MB2 members who were not involved in the original formation of Dental Professionals of Texas, PLLC.

16. Defendant Chris Steven Villanueva is a licensed [License No. 0021919] dentist in the State of Texas. It is believed that Villanueva is not licensed in New Mexico or Louisiana. Villanueva graduated from Dental School at Nova Southeastern University in Florida, and was licensed on July 6, 2004 in general dentistry. He is the owner and Chief Operating Officer of Dental Professionals of Texas, PLLC, and also a member of every Dental Practice Defendant named in this complaint. Villanueva and Tang attended dental school together.

17. Defendant Trung Tang is a licensed dentist [License No. 0021939] in the State of Texas. It is believed that Tang is not licensed in New Mexico or Louisiana Tang graduated from Dental School at Nova Southeastern University, in Florida and was licensed on July 14, 2004 in general dentistry. He is the owner and Executive Officer of Dental Professionals of Texas, PLLC, and is also a member of every Dental Practice Defendant named in this complaint. Tang and Villanueva attended dental school together.

18. Mauricio Dardano is a dentist licensed [License No. 23360] in the States of Texas [License No. DD3376] and New Mexico, having graduated in 2007 from University of Texas in Houston. Dardano has an ownership interest in several of the DPs and was a "senior" member of Dental Professionals of Texas, PLLC.

19. MB2 Dental Solutions, PLLC, is a recently created limited liability company owned and operated by Villanueva and Tang (and others) and has succeeded Dental Professionals of Texas, PLLC. MB2 was specifically created to avoid the scrutiny focused upon Dental Professionals of Texas, PLLC, as a result of the negative publicity concerning Medicaid patient solicitation.

20. Dental Professionals of Texas, PLLC ("DPT") is owned and operated by Villanueva and Tang with some ownership interest held by Dardano. Villanueva is the Chief

8

Executive Officer of DPT.  In published Associate Dentist advertising posted on the University of Texas, School of Dentistry job site, Villanueva describes DPT as follows:  "Our management model was founded on ensuring clinical autonomy for our Doctors, while providing a robust network of peers as a support group.  Dental Professionals of Texas manages over 40 independent practices in Texas, New Mexico, Oklahoma, and Louisiana.  We offer a Doctor driven working atmosphere, with an emphasis on fairness and transparency.  All Dentists are at-will providers; there are no time commitments in our employment agreements.  We offer a clear path to ownership; with virtually no Doctor turnover."[4]

21.     In another published account, DPT was described as "a dental management and practice development firm located in Irving, Texas.  The company provides knowledge, guidance and personalized systems to approximately 45 independently owned and operated dental offices in Texas, Oklahoma and New Mexico."  It further describes the owners of DPT as "Dr. Tang & Dr. Villanueva."[5]

22.     DPT provided all human resources, billing and government regulatory contact for the DPs.  DPT billed Medicaid (for DPs) more than $100,000,000 in 2011.

23.     Villanueva, Tang and DPT purchased or established other dental practices throughout the State of Texas and elsewhere including at least four practices in New Mexico and at least two practices in Louisiana.  Villanueva and Tang hired other dentists to operate out of these businesses based upon a "business plan" and organization, billing, management and incentive program established, created and enforced by DPT.

---

[4]  http://db.uth.tmc.edu/about-school/employment/associate-dentist/5128     [Expires on July 2, 2012.]

[5]  http://www.bill.com/businesses/cs_dental_pro.php.

24.     Villanueva, Tang and DPT hired dentists to provide services at the DPs. In some instances, part of the incentive to follow the illegal and improper corporate management dictates of DPT was an ownership interest in the specific dental practice where the dentist-employee worked.

## IV.     INDIVIDUAL PARTICIPANTS

25.     Kevin Howard Byington ("Byington") is and was in the marketing department for DPT. Byington works directly for Frank Villanueva, Defendant Chris Villanueva's brother and head of the marketing Division of DPT. Byington and Frank Villanueva were responsible for recruiting willing marketers and paying them kickbacks for locating likely Medicaid families with children eligible for dental services and referring those patients and their families to the DP defendants. When DPT's kickback scheme was aired by Dallas news stations, Byington formed KHB Community Outreach Associates, LLC. This was done at the request of Defendants, including DPT (a/k/a MB2), Villanueva and Tang, to cover up and conceal the illegal kickback solicitation scheme.

26.     Frank Villanueva is the brother of Defendant Chris Steven Villanueva and the person primarily responsible for obtaining illegal referrals and direct solicitation of patients for the Defendants. He is and was an employee of DPT (now MB2) and was the person who hired Relator, coercively persuaded her to accept the "promotion" to work for KHB Community Outreach Associates, LLC and coordinated the kickback payments to the referring marketers and the Medicaid parents or family members.

27.     Ann Villanueva, the sister of Defendant Chris Steven Villanueva, is and was the Human Resources Director for DPT (now MB2) and the DP defendants. She assisted in the

recruitment of dentists and other staff and paraprofessionals for the dental offices of DP defendants and for DPT.

28.     Mary Pu is Trung Tang's wife and the Vice President of Finance for Dental Professionals of Texas, PLLC (now MB2). In her position, Pu was knowledgeable about the illegal billing practices, the solicitation of patients, and the budgeted "promotion accounts" for every practice which were actually used for kickback payments. She was and is responsible for the entire accounting team.

29.     John Steen is the Chief Financial Officer of DPT. Steen is shown as the "Authorized Agent" for DPT in signing the February 23, 2012 Certificate of Amendment to the Certificate of Formation of Dental Professionals of Texas, PLLC changing the name to MB2 Dental Solutions, PLLC.[6] Steen ostensibly served as "compliance officer" for Medicaid and in October 2011 he and a "team" consisting of his daughter, Audrey Steen, and one other person allegedly "audited" the various DP Defendants to assure Medicaid compliance. These "audits" were intentionally superficial and incomplete, and were actually intended to conceal the ongoing illegal practices.

30.     Gabriel Shahwan is a dentist and a senior member of DPT, a member of MB2 and has an ownership interest in the Archstone's Ft. Worth practices, Sage offices in Houston and Crescent practices. He is familiar with the kickbacks paid to patient solicitors and to patients and their families for referrals, as well as the overbilling and over-treating of patients.

31.     Akhil Reddy is a dentist and senior member of DPT and has an ownership interest in the Fresh Dental, Bliss and Picasso practices. He is familiar with the kickbacks paid to

---

[6] The certificate is attached hereto as Exhibit 1.

solicitors and to patients and their families for referrals and the overbilling and over-treating of patients.

32.  Sang Trang is and was a dentist working in the Fresh practices.

33.  Andrea Salazar is and was a dentist working in the Bliss practices.

34.  Paul Schahwan is and was a dentist working in the Crescent practices.

35.  Other dentists include Conrad Creed, Brian Hassler and Quinton Parks.

36.  Cynthia Thomas was an employee of Wow Dental – Oakcliff, PLLC.  In addition to her office work, she solicited patients with kickbacks.  As a kickback payment for illegally soliciting and "referring" more than 100 patients per month, Thomas received several television sets, two laptop computers, IPods, an Xbox and PlayStations for her home.  These were given to her by Frank Villanueva and Kevin Byington.

## V.  THE FALSE CLAIMS ACT

37.  The False Claims Act (hereinafter referred to as "FCA"), 31 USC § 3729, was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153.  The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the Patient Protection and Affordable Care Act ("PPACA").  Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.  The amendments were intended to create incentives for individuals with knowledge of Government fraud to disclose the information without fear of reprisals or Government inaction and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.  The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again

in March 2010 by the Patient Protection and Affordable Care Act ("PPACA"). Both FERA and PPACA made a number of procedural and substantive changes to the FCA in an attempt to ease the burden on the government and Relators in investigating and prosecuting *qui tam* suits under the FCA.

38.    The False Claims Act generally provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements material to a false claim, or conspires to engage in such conduct, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Federal Government.

39.    The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. Based on these provisions, Relator seeks, through this action, to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein.

## VI.    FEDERAL HEALTHCARE PROGRAMS

40.    In 1965, the Federal Government also enacted the Medicaid program. Medicaid is the nation's medical assistance program for the needy, the medically-needy aged, blind, and disabled and families with dependent children. 42 U.S.C. §§ 1396-1396v. Medicaid is largely administered by the states and funded by a combination of federal and state funds. The majority of Medicaid funding, however, is provided by the Federal Government. Among other forms of medical assistance, the Medicaid programs cover dental care. 42 U.S.C. §§ 1396a (10)(A) and 1396d (a)(12).

41.     Under the Medicaid program there is an express fundamental condition of payment that the services provided are reasonable and medically necessary.  Most Medicaid providers also sign written agreements providing that only reasonable and necessary services will be billed to Medicaid.

## VII.    THE ANTI-KICKBACK STATUTE

42.     The federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided or obtained that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

43.     The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item or service for which payment may be made under a federally-funded health care program.  42 U.S.C. §1320a-7b (b).  Under this statute companies and persons may not offer, pay or solicit to receive, any remuneration, in cash or kind, directly or indirectly, to induce patients, persons, hospitals, dentists, physicians or other health service providers to order, recommend or arrange for the purchase or lease of any item or service that may be paid for by a federal health care program.

44.     Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment.  42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7).

14

45.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicare, Medicaid, FEHBP, CHAMPUS/TRICARE, and other federal health care programs. With regard to Medicaid, for example, each physician and hospital that participates in the program must sign a provider Agreement with his or her state. Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, which include the anti-kickback and Stark Law provisions.

46.     In a number of states, the Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program, including compliance with Federal laws.

47.     In sum, either pursuant to provider agreements, claims forms, or other appropriate manner, hospitals and physicians (including dentists) who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law and the Stark Law.

48.     Any party convicted under the Anti-Kickback statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. §1320a-7(a)(l). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency(ies) to exclude that provider from health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. §1320a-7(b).

49.    The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.    Thus, compliance with the Anti-Kickback statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicaid and other federal health care programs.    Reimbursement is also prohibited by the general legal principle that providers who are corrupt or unethical or violate the integrity of a government program involving government funds are not entitled to payment from the public treasury for the resulting claims.

## VIII.   SUBSTANTIVE CLAIMS

50.    Villanueva and Tang, classmates at dental school, devised a scheme to defraud the federal government and State of Texas by illegally paying kickbacks to "marketers" who referred patients to the various dental practices owned, managed, operated and funded by Villanueva, Tang and at times Dardano.    In an attempt to insulate themselves from the scheme, Villanueva, Tang and Dardano created a number of professional limited liability companies and limited liability companies, including the "management" company known initially as Dental Professionals of Texas, PLLC and changed recently to MB2 Dental Solutions, PLLC.

51.    The scheme involved a large cadre of solicitors whose job was to recruit Medicaid patients and refer them to Villanueva and Tang's dental practices.    These workers were initially paid a set amount (kickback) for every Medicaid patient referred.    In addition, additional payments and "gifts" were paid whenever a worker brought more than 100 Medicaid patients into the dental practice defendants' offices in any month.    These additional payments ranged from cash to Xbox games, IPods, televisions and other desirable electronics.

52.     Every dental practice defendant used these paid workers to solicit referrals for their dental practice.  The payment was only made if the Medicaid patient actually registered at the dental office and received "services."  These kickbacks were paid by check through DPT.  The additional kickbacks, such as the gifts described above, were paid by DPT as well.

53.     Frank Villanueva and Kevin Byington actually handed out the "bonus" kickbacks to the workers who provided more than 100 referrals per month.

54.     One recipient of these "bonus" kickbacks was Cynthia Thomas who initially worked for Wow dental and later Texas Community Outreach.  She received various expensive electronic kickbacks for referring more than 100 patients per month.  She routinely exceeded this referral quota and accepted money and electronics for her performance.

55.     This process of soliciting referrals for patients was successful because of the kickback payments to patients and their families.  Parents of potential Medicaid dental patients were paid kickbacks to bring their children to the Defendants and family members were paid to refer other family members and additional children.

56.     Each dental practice office had a budgeted line item for "promotions" which was used to purchase the kickback items given to family members.  These kickbacks ranged from food to Wal-Mart gift cards, certificates for free manicures/pedicures, IPod Shuffles and other "gift" items.

57.     While Relator served as the office manager and Regional Manager of the two Wow Dental offices, these offices had a monthly budget for "promotions" in the thousands of dollars per month per office.[7]  Other DP Defendant offices had a similar budget.  The funds for

---

[7] The line item may have been shown as "promotion/advertising/marketing."

legitimate advertising, signs and banners did not come out of this fund, which was used solely to pay kickbacks to Medicaid patients and their families.

58.     Although these defendant dental practices continued to treat self-pay and PPO patients, between eighty-five to ninety percent (85%-90%) of all patients at DP offices were in the Medicaid program.

59.     As a result of the kickback schemes, the dental offices of the Defendants were so busy and crammed with patients that the wait to see a dentist were often long.  Patients and their families were provided food and beverages to compensate them for the wait to be seen by a dentist.

60.     Dentists hired to work in DP offices were paid based upon the billings they generated and received a percentage of the "take."  This system was intended to and did encourage these dentists to see a far greater number of Medicaid patients each day than proper dental care would permit.  It also encouraged providing Medicaid children medically unnecessary and unreasonable dental treatment to increase billings.

61.     Villanueva, Tang, DPT and the other Defendants knew that the billings were fraudulent based on the sheer numbers of patients "treated" daily and monthly billings, together with the enormous services billing per patient.  DPT submitted these billings for all of the DP defendants to Medicaid.

62.     In order to establish a competition between dental practices, DPT allowed all of the dental practice offices to know the number of patients and daily billings of other dental practice offices.  There was constant pressure from "corporate" (meaning from Villanueva, Tang and DPT and their employees) to increase "production" which included increasing the numbers of patients seen daily and the amount of "services" billed for each patient.

18

63.     All of the staff and dentists working for Defendants knew that Medicaid would pay up to $2,000 for dental care for a Medicaid patient.  With that goal in mind, DPT and DPs sought to maximize billings up to that amount for every patient—whether they needed the dental work or not.[8]

64.     Particularly illustrative is one day at Wow Dental when Relator was the office manager.  On September 16, 2011 there were three dentists present at the practice.  Office hours were 9:00 a.m. to 6:00 p.m. weekdays.  On that one day Wow Dental dentists billed for treating ninety (90) Medicaid patients.  The total billing for that *day* was more than sixty-three thousand dollars ($63,000), averaging about seven hundred dollars ($700) per patient.  The average amount of time that a dentist spent with a patient[9] was 16 minutes.  The work that was billed to Medicaid for each patient - including multiple fillings, crowns and other expensive procedures.- would have been physically impossible to perform in any given day.[10]

65.     Dentists and staff were directed by DPT employees that all possible treatment should be provided/or billed on the first visit because Medicaid patients could switch dentists at will and might not return.  Given the tortuous treatment that each child received, it was assumed that the patient would not return to this office for any additional dental services.  As a result, there was constant pressure to maximize billings and income for defendants and dentists.

---

[8]  The Relator has provided a list of patients and procedures for which Medicaid was billed from Wow Dental for the period from 1/1/2010 until 6/29/2012 as part of her Disclosure Memorandum.  A sample of pages from that document, which consists of more than 1,900 pages, is attached hereto as Exhibit 2.

[9]  This average is based upon the assumption that the dentists only took a lunch break, did not take any telephone calls or handle any personal business, and used every minute of the eight hour work day to treat patients.

[10]  The billing rates at the specific time of billing may be located on the TMHP website and more specifically at: http://public.tmhp.com/FeeSchedules/Default.aspx.

66.     On that one day described above, the Wow dental practice billed more than Chris Villanueva Dental, PA which was normally the highest billing practice.

67.     As a result of the enormous numbers of patients at each of the Defendant DPs, Medicaid requirements for identification and documentation were frequently ignored.  This includes Defendants' failure to obtain proper identification of the purported Medicaid patient, failure to create or maintain patient charts and failure to obtain proper consent forms for treatment.

68.     Relator, who has more than a decade of prior experience including dental practice billing, states that a dentist will normally see and properly treat about ten (10) to fifteen (15) patients per day.  At Wow and other DP defendants' offices it was routine for dentists to "treat" between thirty (30) and forty (40) patients per day.

69.     Based on her training and experience, Relator advises that dentists should only work on one or at most two quadrants of a patient's mouth in any given office visit.  This was due to the stress on the patient, good dental practice and the time that it should take to properly perform services on a patient.  This is particularly true when treating young children.

70.     The Defendants routinely performed work in all four quadrants of a Medicaid child's mouth on the first visit, billing for four quadrant treatments and services.

71.     Dentists working at Wow and other DP defendants frequently told staff, including Relator, that they needed to treat an identified number of patients per day in order to make enough money to pay off a personal payment or bill.[11]

---

[11] Relator specifically recalls directions by Dentist Christopher Duong (TX License No. 27538) who had gotten a traffic ticket and insisted that he needed to bill at least $10,000 that day so that he could pay the fine.

72.     By October 2011, a news station in Dallas had begun a series of reports on the payments of kickbacks for patients in the Dallas/Ft. Worth areas of Texas.  As a result of that publicity, Defendants decided to modify their kickback scheme.  The executives of DPT, including Frank Villanueva, created a "new" entity, KHB Community Outreach Associates, LLC ("KHB") which was known as Texas Community Outreach Associates.  Byington was listed as the owner of KHB.

73.     The purpose of creating KHB was to disguise the illegal kickback nature of the business - exactly the same marketeering and referral scheme developed by Defendants previously.  The only difference is that DPT contracted with KHB to provide services.  KHB is and was operated from the same office as DPT/MB2.  Large numbers of workers worked for KHB to directly solicit and refer patients to Defendants.  KHB had only one "customer" - and that was DPT/MB2.

74.     KHB employees wore "community outreach" tee shirts and continued the practices of illegal patient referrals.  These workers were paid on an hourly basis by KHB.[12]

75.     KHB paid these workers from an account at Bank of America that was funded by Villanueva, Tang and Dardano through DPT.  The initial deposit was about one-million dollars ($1,000,000).  Although Relator was initially told she would have signature authority on the account, she never wrote any checks nor gained access to specific account information.  Relator did have both access and authority for the ADP check services.

---

[12]  Relator has provided as part of the Disclosure Memorandum served upon the United States two sets of print-outs from ADP, a check processing company - one 77 pages long and the other 68 pages in length - showing the amounts paid and workers employed by DPT through the sham company created by DPT and the individual defendants.

76.     The attempt to disguise the referral workers as unrelated to DPT and the other Defendants is easily unveiled by reviewing the KHB printout from ADP's payroll register. A few sample pages from that register are attached hereto as Exhibit 3. Under each worker's name is a code for "Dept:" and the name of the specific dental practice office for which illegal referrals were made by the worker. For example, under **Lopez, Patricia** it shows "**Dept: ARCHBCH**" which reflects that this worker received kickbacks for referrals to Defendant Archstone Dental-Beach, PLLC. Another example is **Cavazos, Michelle** whose Dept is shown as **B-LUBB** which reflects that she provided illegal referrals to Defendant Bliss Dental-Lubbock, PLLC. Although the kickbacks are shown as hourly wages and are paid through "middleman" KBH, the Defendants paid these kickbacks in violation of the FCA and Anti-kickback provisions of federal and Texas law.

77.     As the news station's "investigation" of Medicaid dental practices in Texas continued, Villanueva and Tang together with the DPT/MB2 senior staff are improvising new schemes to obtain referrals. Additionally these Defendants employed similar schemes in the States of Louisiana and New Mexico where they opened practices to continue the scheme out of the limelight cast by the Texas publicity.

78.     As of July 1, 2012, KHB is "closing down" and has terminated most or all of its employees. Kevin Byington continues to work for DPT/MB2.

79.     As a result of the payment of illegal kickbacks to "professional" marketers and to patients and their families, KHB and the Defendants grossed more than one hundred million dollars in Medicaid billings for 2011.

80.     Defendants have experienced a dramatic reduction in gross income in 2012 which can be attributed to their defensively cutting back their illegal kickback marketing scheme and the resulting decrease in the flow of solicited patients.

81.     Relator believes that Villanueva, Tang and Dardano through various DPs and other companies have considerable real and personal assets such as real estate, including the property upon which the DPs are located. Further Relator has been informed that these Defendants have moved substantial funds into the names of family members and others in an attempt to secret those funds from the government.

## COUNT I

### FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)(A)and (C)(2010)

82.     Relator repeats and realleges each allegation contained in paragraphs 1 through 81, above as if fully set forth herein.

83.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

84.     Defendants, individually and by and through their officers, agents, employees, related companies, subsidiaries and holding companies, knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A)(2010).

85.     As set forth in the preceding paragraphs, Defendants conspired with each other and others in paying and receiving illegal kickbacks, billing for dental services that were not provided or provided in violation of governmental regulations, and, in a campaign to defraud the United States by getting false and/or fraudulent Medicaid and other Government health care claims paid in violation of 31 U.S.C. § 3729(a)(1)(C) (2010).

23

86.     Defendants, individually and by and through their officers, agents, and employees, authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

87.     As a result of the acts of Defendants, the United States Government reimbursed dentists and dental practices for patients and procedures for which it otherwise would not have paid.

88.     Each patient referred to any of the Defendants as a result of a kickback and for whom dental procedures were undertaken that were not medically reasonable or necessary represents a false or fraudulent record or statement.

89.     Every patient service billed by DPT or the other Defendants for dental services that were not medically necessary, were improperly performed and/or were not medically necessary submitted to Medicaid or another federal dental care program represents a false or fraudulent claim for payment.

90.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.  Medicaid has paid for thousands of dental procedures and exams performed by Defendants which did not provide a benefit to the patients, and the corresponding claims to federally funded health care programs were a foreseeable and intended result of Defendants' illegal acts.

91.     As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729 *et seq.* and have thereby damaged the United States Government.  The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim paid or approved.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)     That the Court award such other and further relief as it deems proper.

## COUNT II

### FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)(B) and (C) (2010)

92.     Relator repeats and realleges each allegation contained in paragraphs 1 through 81, above as if fully set forth herein.

93.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

94.     Defendants, individually and by and through its officers, agents, employees, related companies, subsidiaries and holding companies, knowingly made, used, or caused to be

made or used, false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B) (2010).

95.     As set forth in the preceding paragraphs, Defendants conspired with each other and others to obtain Medicaid patients by the payment of kickbacks and to provide inadequate dental services, unreasonable and medically unnecessary services and products and billing for services that were not provided to these Medicaid patients in violation of Medicaid and related government regulations to defraud the United States by getting false and/or fraudulent Medicare and other Government dental care claims paid in violation of 31 U.S.C. § 3729(a)(1)(B) and (C) (2010).

96.     Defendants made false statements concerning their compliance with Medicaid identification, record keeping and charting requirements  in violation of Medicaid and related government regulations to defraud the United States by getting false and/or fraudulent Medicare and other Government dental care claims paid in violation of 31 U.S.C. § 3729(a)(1)(B) and (C) (2010).

97.     Defendants, individually and by and through their officers, agents, and employees authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

98.     As a result of the acts of Defendants, the United States Government reimbursed dentists and dental practices for patients and procedures that it otherwise would not have paid had Defendants not given kickbacks and other inducements to "marketers" and family members of Medicaid eligible children.

99.     Every billing for dental services as a result of Defendants' illegal conduct and/or illegal inducements represents a false or fraudulent record or statement.   Each claim for

reimbursement for such, submitted to Medicaid or other federal health insurance program, represents a false or fraudulent claim for payment.

100. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Medicaid has paid for services which they otherwise would not have paid for but for Defendants' fraudulent and illegal conduct. These false claims to Medicaid and other federally funded health care programs were a foreseeable and intended result of Defendants' illegal acts.

101. As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729 *et seq.* and have thereby damaged the United States Government. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim paid or approved.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)     That the Court award such other and further relief as it deems proper.

**COUNT III**

**ANTI-KICKBACK VIOLATIONS**
**42 U.S.C. §1320a-7b(b)(2)(A) and (g)(2010)**

102.    Relator repeats and realleges each allegation contained in paragraphs 1 through 81, above as if fully set forth herein.

103.    This is a claim for treble damages and penalties under the Anti-Kickback Provisions, 42 U.S.C. § 1320a-7a, *et seq.*, as amended.

104.    Defendants, individually and by and through their officers, agents, employees, related companies, subsidiaries and holding companies, knowingly paid kickbacks directly and indirectly, in cash and in kind to "workers," KHB Community Associates, LLC, patients and/or patients' family members to refer patients to them for the furnishing of dental services and items for which Defendants believed payment would be made in whole or in part by Medicaid in violation of 42 U.S.C. § 1320a (2010).

105.    Defendants, individually and by and through its officers, agents, and employees, authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

106. As a result of the acts of Defendants, the United States Government reimbursed dentists and dental practices for patients and procedures that it otherwise would not have paid had Defendants properly reported the payment of said kickbacks.

107. Every billing for each patient obtained as a result of Defendants' illegal conduct represents a prohibited referral. Each claim for reimbursement for such patient and for every item and service claimed and submitted to Medicaid or any other federal health insurance program, represents an unlawful billing or claim.

108. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Federal health insurance programs have paid numerous claims for services provided by Defendants in violation of the federal Anti-Kickback law. These prohibited claims to federally funded health care programs were a foreseeable and intended result of Defendants' illegal acts.

109. As set forth in the preceding paragraphs, Defendants have knowingly violated 42 U.S.C. § 1320a-7b(g) *et seq.* and have thereby damaged the United States Government. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not more than $11,000 for each prohibited false statement or claim paid or approved.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the prohibited referral and claims alleged within this Complaint, as the Anti-Kickback Law, 42 U.S.C. § 1320a *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every prohibited bill or claim that Defendants caused to be presented to Medicaid or other government Healthcare Programs under the Anti-Kickback Law;

(c)     That other civil sanctions and penalties including reimbursement for all payments made in violation of the Anti-Kickback Law;

(d)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(e)     That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(f)     That the Court award such other and further relief as it deems proper.

## COUNT IV

### TEXAS FALSE CLAIMS ACT

Texas Medicaid Fraud Prevention Law
V.T.C.A., Hum. Res. Code Ann. §36.001

110.    Relator realleges and incorporates by reference paragraphs 1 through 81 as though fully set forth herein.

111.    This is a *qui tam* action brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A., Hum. Res. Code § 36.001 *et seq.*

112.    V.T.C.A., Hum. Res. Code § 36.002 provides liability for any person who:

(1)     knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact

(a)    on an application for a contract, benefit, or payment under the Medicaid program; or

30

(b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program.

(2) knowingly or intentionally concealing or failing to disclose an event:

(A) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of.

(i) the person, or

(ii) another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

(B) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

(4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning

(C) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

113. Defendants violated V.T.C.A., Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct described herein.

114. The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, unaware of Defendants' conduct, paid the claims submitted by dentists, dental practices, laboratories and third party payers in connection therewith.

115. Compliance with applicable Medicaid and the various other federal and state laws cited herein was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct.

116.    Had the State of Texas known that false representations were made by Defendants, it would not have paid the claims submitted by Defendants.

117.    As a result of Defendants' violations of V.T.C.A., Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount to be determined by the jury.

118.    Defendants did not, within thirty days after they first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

119.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A., Hum. Res. Code § 36.101 *et seq.,* on behalf of himself and the State of Texas.

120.    Relator requests that this Court accept pendant jurisdiction over this related State claim as it is predicated upon the same exact facts as the federal claims, and merely asserts separate damages to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Texas:

(1)    Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $15,000 pursuant to V.T.C.A., Hum. Res. Code § 36.052(a)(3) for each false claim which Defendants caused to be presented to the state of Texas;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to V.T.C.A., Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT V

### LOUISIANA FALSE CLAIMS ACT

Louisiana Medical Assistance Programs Integrity Law
La. Rev. Stat. §46:438.3

121.    Relator realleges and incorporates by reference paragraphs 1 through 81 as though fully set forth herein.

122.    This is a *qui tam* action brought by Relator on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§46:439.1 *et seq.*; 438.3

123.    La. Rev. Stat. Ann. § 46:438.3 provides:

(A)   No person shall knowingly present or cause to be presented a false or fraudulent claim;

(B)   No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

33

> (C)  No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

124.  Defendants violated La. Rev. Stat. Ann. §46:438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by engaging in the conduct described herein.

125.  The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

126.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendant's conduct.

127.  Had the State of Louisiana known that false representations were made by Defendants, it would not have paid the claims.

128.  As a result of Defendants' violations of La. Rev. Stat. Ann. § 46:438.3, the State of Louisiana has been damaged in an amount to be determined by the jury.

129.  Relator is a private citizen with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. §46:439.1 *et seq.* on behalf of herself and the State of Louisiana.

130.  Relator requests that this Court accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Louisiana:

(1)    Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to La. Rev. Stat. § 46:439.4(A) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT VI

### NEW MEXICO FALSE CLAIMS ACT

New Mexico Medicaid False Claims Act
NMSA 1978 §§27-14-4(A); 44-9-3

131.    Relator realleges and incorporates by reference paragraphs 1 through 81 as though fully set forth herein.

35

132.    This is a *qui tam* action brought by Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act N.M. Stat. Ann§§ 27-14-1 *et seq.*; which, in pertinent part, provides liability to any person who:

> A.  presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that such claim is false or fraudulent;

> B.  presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that the person receiving a medicaid benefit or payment is not authorized or is not eligible for a benefit under the medicaid program;

> C.  makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false;

> D.  conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing that such claim is false or fraudulent;

> E.  makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the medicaid program, knowing that such record or statement is false;

and the Fraud Against Taxpayers Act, 44-9-1 *et seq.*, which, in pertinent part, provides liability to any person who:

> (1)  knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds a false or fraudulent claim for payment or approval;

> (2)  knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

36

(3) conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim.

133. Defendants violated, N.M. Stat. Ann§§ 27-14-1 *et seq.*; and 44-9-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by engaging in the conduct described herein.

134. The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted.

135. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct.

136. Had the State of New Mexico known that false representations were made it would not have paid the claims submitted.

137. As a result of Defendants' violations of N.M. Stat. Ann§§ 27-14-1 *et seq.*, and 44-9-1 *et seq.,* the State of New Mexico has been damaged in an amount to be determined by the jury.

138. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action on behalf of herself and the State of New Mexico.

139. Relator requests that this Court accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the State of New Mexico:

(1)     Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to N.M. Stat. Ann §§ 27-14-1; 44-9-1 *et seq.* and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the State of Texas, and on his own behalf, demands judgment against Defendants, and each of them, as follows:

A.     That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.* and the equivalent provisions of the state statutes set forth above;

B.     That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defend-

ants' actions, plus a civil penalty of $11,000 for each false claim, together with the costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

  C.  That this Court enter judgment against Defendants, and each of them, for the maximum amount of actual damages and civil penalties permitted under the false claims statutes of the State of Texas;

  D.  That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each bill or claim submitted in violation of the Anti-Kickback Law, together with the costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

  E.  That Relator be awarded all costs incurred, including her attorneys' fees;

  F.  That, in the event the United States Government subsequently intervenes in this action, Relator be awarded 25% of any proceeds of the claim and that, in the event the United States Government does not intervene in this action, Relator be awarded 30% of any proceeds;

  G.  That Relator be awarded the maximum percentage of any proceeds of the claim permitted under the Texas, V.T.C.A., Hum. Res. Code § 36.001 *et seq.*, Louisiana, La. Rev. Stat. § 46:439.4(A) and New Mexico, NMSA 1978 §§27-14-4(A); 44-9-3.

  H.  That the United States and Relator receive all relief, both in law and in equity, to which they are entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of Federal Rules of Civil Procedure, Plaintiffs and Relator hereby demand a trial by jury.


Dated: September 25, 2012

Respectfully submitted,

Mark Schlein, **Trial Counsel**
Florida Bar No. 0000700
(*Pro Hac Vice application submitted*)
Diane Marger Moore
Florida Bar No. 268364
(*Pro Hac Vice application submitted*)
BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Tel: 310-207-3233      Fax: 310-207-4204
mschlein@baumhedlundlaw.com

*Attorneys for Relator, Veronica Garcia*

## CERTIFICATE OF SERVICE

I, Mark H. Schlein, hereby certify that, on September 25, 2012, I served a true copy of the foregoing document on the below persons via Federal Express overnight service.

Mark Schlein

Eric Holder, Jr., Esq.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Sarah R. Saldana, Esq.
United States Attorney
Northern District of Texas
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

Sean McKenna, Esq.
Assistant U.S. Attorney, Civil Division
Northern District of Texas
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

Office of the Attorney General for the State of Texas
Kerry M. Ascher, Esq.
Asst. Attorney General
Texas Civil Medicaid Fraud Control Unit
300 W. 15th Street, 9th Floor
Austin, TX 78701

Align top of **FedEx Express**

# FedEx Express



Page 1 of 3

From: (310) 207-3233
Gary Brown
Baum Hedlund
12100 Wilshire Blvd

Los Angeles, CA 90025

Origin ID: CIBA

Ship Date: 25SEP12
ActWgt: 2.0 LB
CAD: 100551585/INET3300

**BILL SENDER**

SHIP TO: (214) 753-2200
**Civil Filing Clerk
US Dist. Court, No. Dist. of Texas
1100 COMMERCE ST
STE 1452
DALLAS, TX 75242**

Delivery Address Bar Code

Ref #
Invoice #
PO #
Dept #

Garcia, V



SEP 2 6 2012

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

TRK#   7990 5027 6960
9281

**WED - 26 SEP A1
STANDARD OVERNIGHT**

**75242**
TX-US
**DFW**

# AD RBDA

© 2011 FedEx 158396 REV 1/11

Align bottom of **Peel and Stick**